# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT FOOTE, derivatively on behalf of MICRON TECHNOLOGY, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>SANJAY MEHROTRA, ROBERT L. BAILEY, RICHARD M. BEYER, PATRICK J. BYRNE, LYNN A. DUGLE, STEVEN J. GOMO, MERCEDES JOHNSON, MARY PAT MCCARTHY, LAWRENCE N. MONDRY, ROBERT E. SWITZ, and MARYANN WRIGHT<br><br>        Defendants,<br><br>    and<br><br>MICRON TECHNOLOGY, INC.,<br><br>        Nominal Defendants. | C.A. No.<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Robert Foote ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Micron Technology, Inc. ("Micron" or the "Company") files this Verified Shareholder Derivative Complaint against Individual Defendants Sanjay Mehrotra ("Mehrotra"), Robert L. Bailey ("Bailey"), Richard M. Beyer ("Beyer"), Patrick J. Byrne ("Byrne"), Lynn A. Dugle ("Dugle"), Steven J. Gomo ("Gomo"), Mercedes Johnson ("Johnson"), Mary Pat McCarthy ("McCarthy"), Lawrence N. Mondry ("Mondry"), Robert E. Switz ("Switz"),

and MaryAnn Wright ("Wright") (collectively, the "Individual Defendants," and together with Micron, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Micron, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Micron, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Though Micron has, since 2018, publicly held itself out as undertaking to improve diversity, equality, and inclusion within the Company, the Micron Board itself has lacked diversity at all relevant times, without any Black directors and the only director of color being the CEO, Defendant Mehrotra.

2.     Moreover, though publishing a Diversity, Equality, and Inclusion Report ("DEI Report") every year since 2018, and touting their diversity efforts in the Company's yearly Proxy Statements, the actions of Defendants demonstrate these are hollow words, given that the Company's workforce has not become meaningfully more diverse during this time. In 2018, when Micron began disclosing demographic data and publicly committed to increasing diversity, Black

individuals constituted 3% of Micron's workforce and Hispanic/Latinx individuals constituted 4%. In 2020, two years into these alleged efforts, the Company's workforce was still 3% Black and only 4.6% Latinx, per the Company's own DEI Report.

3.      In addition, the Company's self-defined senior leadership has not grown meaningfully more diverse during this time either. In 2018, there was less than 1% Black senior leadership and only 1% Hispanic/Latinx senior leadership.  By 2020, these figures had hardly improved. Black individuals made up only 1% of senior leadership and Latinx individuals made up 2.7%.

4.      All the while, the opportunity to diversify the workforce through new hires was present but was squandered. Since 2018, when the Company employed approximately 34,000 people, until 2020, when the Company employed approximately 39,392 people, the Company's workforce expanded by a *net* amount of over 5,000, with additional opportunities to diversify through replacing employees in the course of employee turnover occurring even absent growth.

5.      From 2018 to the present, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make materially false and misleading statements which failed to disclose that: (1) despite public assertions to the contrary diversity was not a key priority of the Company; (2) despite assertions to the contrary the Company was not meaningfully diversifying its workforce; (3) despite assertions to the contrary the Company was not diversifying its leadership or its Board of Directors; (4) that the Company failed to maintain adequate internal controls, and (5) that the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls.

6.      Moreover, the Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

7.      In addition, the Individual Defendants breached their fiduciary duties by continuing to appoint PricewaterhouseCoopers LLP ("PwC") as independent auditor despite PwC not being independent and failing to identify the inadequate internal controls.

8.      The Individual Defendants also breached their fiduciary duties by causing themselves to receive excessive compensation, including because certain executive compensation was nominally tied, in part, to the achievement of diversity-related goals. This excessive compensation is particularly so because of their misconduct, but is also true relative to compensation at comparable companies regardless of any misconduct.

9.      In addition, by including false and misleading statements concerning the Company's diversity efforts in each of the 2018, 2019, and 2020 Proxy Statements (defined below), the Individual Defendants violated Section 14(a) of the Exchange Act.

10.     As a result of the Individual Defendants' misconduct, which has subjected Micron to this and potentially other lawsuits, the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who received excessive compensation and/or who benefitted from the wrongdoing alleged herein, the Company has, and will have, to expend many millions of dollars.

11.     Because the breaches of fiduciary duty committed by the Individual Defendants, seven of whom are the Company's current directors constituting the entirety of the present Board, their collective engagement in the scheme to cause the Company to make false and misleading statements, the substantial likelihood of the directors' liability in this derivative action, their being

beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Micron's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a). This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Micron is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of Micron common stock. Plaintiff has continuously held Micron common stock since February 2018.

### Nominal Defendant Micron

17.     Micron is a Delaware corporation with its principal executive offices at 8000 South Federal Way, Boise, Idaho 83716. Micron's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MU."

**Defendant Mehrotra**

18.     Defendant Mehrotra has served as a director and as the Company's CEO and President since May 2017. Defendant Mehrotra has also served as a member of the Finance Committee since May 2017. According to the Company's Schedule 14A filed with the SEC on December 1, 2020 (the "2020 Proxy Statement"), as of November 18, 2020, Defendant Mehrotra beneficially owned 1,256,113 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 18, 2020 was $60.74, Defendant Mehrotra owned approximately $76.3 million worth of Micron stock.

19.     For the fiscal year ended September 3, 2020, Defendant Mehrotra received $19,995,488 in compensation, including $1,369,039 in salary, $14,999,989 in stock awards, $3,591,001 in non-equity incentive plan compensation, and $35,459 in all other compensation. For the fiscal year ended August 29, 2019 Defendant Mehrotra received $16,944,751 in compensation from the Company. This included $1,286,154 in salary, $11,999,963 in stock awards, $3,640,000 in non-equity incentive plan compensation, and $35,459 in all other compensation. For the fiscal year ended August 30, 2018, Defendant Mehrotra received $14,241,583 in compensation from the Company. This included $1,200,000 in salary, $7,499,952 in stock awards, $2,500,001 in option awards, $3,000,000 in non-equity incentive plan compensation, and $41,630 in all other compensation.

20.     Upon information and belief, Defendant Mehrotra is a citizen of California.

21.    The Company's Proxy Statement filed on December 1, 2020 (the "2020 Proxy Statement") stated the following about Defendant Mehrotra, in relevant part:

- Mr. Mehrotra has served as Micron's President, Chief Executive Officer, and Director since May 2017.
- Prior to that, Mr. Mehrotra co-founded and led SanDisk Corporation as a start-up in 1988 until its eventual sale in May 2016, serving as its President and Chief Executive Officer from January 2011 to May 2016 and as a member of its Board of Directors from July 2010 to May 2016.
- Within the past five years, Mr. Mehrotra served on the Board of Directors of Cavium, Inc. and Western Digital Corp.

* * *

Mr. Mehrotra has 40 years of experience in the semiconductor memory industry, and as a co-founder of SanDisk, he offers a unique perspective on the industry and has significant senior leadership and technological expertise. In addition, Mr. Mehrotra's experience provides our Board expertise in finance, corporate development, corporate governance, and business strategy, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Mr. Mehrotra to serve as a member of our Board of Directors.

**Defendant Bailey**

22.    Defendant Bailey served as a Company director since October 2007 until January 2021, when he declined to stand for reelection. He also served as a member of the Audit Committee and the Finance Committee. Previously, he served as a member of the Governance Committee. According to the 2020 Proxy Statement, as of November 18, 2020, Defendant Bailey beneficially owned 112,398 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 18, 2020 was $60.74, Defendant Bailey owned more than $6.8 million worth of Micron stock.

23.    For the fiscal year ended September 3, 2020, Defendant Bailey received $375,001 in compensation, including $125,000 in fees earned or paid in cash and $250,001 in stock awards. For the fiscal year ended August 29, 2019, Defendant Bailey received $375,018 in compensation

from the Company, including $125,000 in fees earned or paid in cash and $250,018 in stock awards. For the fiscal year ended August 30, 2018, Defendant Bailey received $373,214 in compensation from the Company. This included $123,231 in fees earned or cash paid and $249,983 in stock awards.

24.     Upon information and belief, Defendant Bailey is a citizen of Washington.

25.     The Company's Schedule 14A filed with the SEC on December 9, 2019 (the "2019 Proxy Statement") stated the following about Defendant Bailey:

- Interim Chief Executive Officer of Blue Willow Systems, Inc., a software as a service resident safety platform for senior living facilities, from August 2017 until August 2018
- Chairman of the Board of Directors of PMC-Sierra, Inc. from 2005 until May 2011, also served as a director of PMC from October 1996 to May 2011 and was PMC's Chairman from February 2000 until February 2003 and Chief Executive Officer from July 1997 until May 2008.
- Within the past five years, Mr. Bailey also served on the Board of Directors of Entropic Communications.

* * *

Mr. Bailey's experience as chief executive officer and director of a leading public technology company provides our Board expertise in the technology industry and also in corporate strategy, financial management, operations, marketing, and research and development, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Mr. Bailey to serve as a member of our Board of Directors.

**Defendant Beyer**

26.     Defendant Beyer has served as a Company director since January 2013. He also serves as the Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of November 18, 2020, Defendant Beyer beneficially owned 91,174 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 18, 2020 was $60.74, Defendant Beyer owned more than $5.5 million worth of Micron stock.

27.     For the fiscal year ended September 3, 2020, Defendant Beyer received $395,001 in total compensation, including $145,000 in fees earned or paid in cash and $$250,001 in stock awards. For the fiscal year ended August 29, 2019, Defendant Beyer received $395,018 in compensation, including $145,000 in fees earned or paid in cash and $250,018 in stock awards. For the fiscal year ended August 30, 2018, Defendant Beyer received $375,633 in compensation from the Company. This included $125,650 in fees earned or cash paid and $249,983 in stock awards.

28.     Upon information and belief, Defendant Beyer is a citizen of California.

29.     The Company's 2020 Proxy Statement stated the following about Defendant Beyer, in relevant part:

- Chairman and Chief Executive Officer of Freescale Semiconductor, Inc. from 2008 through June 2012; director from 2008 to 2013
- Prior to Freescale, Mr. Beyer was President, Chief Executive Officer and a director of Intersil Corporation from 2002 to 2008.
- Mr. Beyer previously served in executive management roles at FVC.com, VLSI Technology, and National Semiconductor Corporation, and served three years as an officer in the United States Marine Corps
- Within the past five years, Mr. Beyer served on the Board of Directors of Microsemi Corporation and Analog Devices, Inc.

* * *

Mr. Beyer's experience as the Chief Executive Officer and a director at leading technology companies provides our Board expertise in the technology industry and also in corporate strategy, financial management, operations, marketing, and research and development, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Mr. Beyer to serve as a member of our Board of Directors.

**Defendant Byrne**

30.     Defendant Byrne served as a Company director from April 2011 until his resignation in January 2020. He served as a member of the Compensation Committee and the Audit Committee. Previously, Defendant Byrne served as a member of the Governance Committee.

31. For the fiscal year ended September 3, 2020, Defendant Byrne received $296,805 in total compensation, including $46,804 in fees earned or paid in cash and $250,001 in stock awards. For the fiscal year ended August 29, 2019, Defendant Byrne received $375018 in total compensation, including $125,000 in fees earned or paid in cash and $250,018 in stock awards. For the fiscal year ended August 30, 2018, Defendant Byrne received $373,214 in compensation from the Company. This included $123,231 in fees earned or cash paid and $249,983 in stock awards.

32. In addition, Defendant Byrne is the President of Tektronix, a subsidiary of Fortive Corporation, which the Company paid approximately $2,670,000 during the fiscal year ended August 30, 2018 and through November 19, 2018 for various equipment and maintenance purchases.

33. Upon information and belief, Defendant Byrne is a citizen of California.

34. The Company's Schedule 14A filed on December 6, 2018 with the SEC (the "2018 Proxy Statement") stated the following about Defendant Byrne:

> *Patrick J. Byrne* has served as Senior Vice President of Fortive Corporation since July 2016, when Danaher Corporation completed the separation of its Test & Measurement and Industrial Technologies segments, and as President of Tektronix, now a subsidiary of Fortive Corporation, since July 2014. Previously, he was Vice President of Strategy and Business Development and Chief Technical Officer of Danaher from November 2012 to July 2014. Danaher designs, manufactures, and markets innovative products and services to professional, medical, industrial, and commercial customers. Mr. Byrne served as Director, President and Chief Executive Officer of Intermec, Inc. from 2007 to May 2012. Within the past five years, Mr. Byrne served on the Board of Directors of Flow International. Mr. Byrne holds a BS in Electrical Engineering from the University of California, Berkeley and an MS in Electrical Engineering from Stanford University.
>
> Mr. Byrne's experience in executive management at public companies has given him expertise in the technology industry as well as business operations, finance, corporate development, corporate governance and management.

**Defendant Dugle**

35.     Defendant Dugle has been a Company director since August 2020. She also serves as a member of the Finance Committee. According to the 2020 Proxy Statement, as of November 18, 2020, Defendant Dugle beneficially owned 5,580 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 18, 2020 was $60.74, Defendant Dugle owned approximately $339,000 worth of Micron stock.

36.     For the fiscal year ended September 3, 2020, Defendant Dugle received $28,378 in compensation, including $10,450 in fees earned or paid in cash and $17,928 in stock awards.

37.     Upon information and belief, Defendant Dugle is a citizen of Virginia.

38.     The 2020 Proxy Statement says the following about Defendant Dugle, in relevant part:

-     Chairman, Chief Executive Officer, and President of Engility Holdings Inc., an NYSE-listed engineering services firm, from 2016 to 2019.
-     Prior to Engility, Ms. Dugle was Vice President, President of Intelligence and Information Systems of Raytheon Company from 2009 to 2015.

* * *

Ms. Dugle's experience as chairman and chief executive officer of a public engineering services firm and senior officer of a leading public technology company provides our Board expertise in information, technology, cyber security, corporate strategy, operations, and research and development, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Ms. Dugle to serve as a member of our Board of Directors.

**Defendant Gomo**

39.     Defendant Gomo has served as a Company director since October 2018. He also serves as the Chair of the Audit Committee and as a member of the Finance Committee. According to the 2020 Proxy Statement, as of November 18, 2020, Defendant Gomo beneficially owned 15,353 shares of Company common stock. Given that the price per share of the Company's

common stock at the close of trading on November 18, 2020 was $60.74, Defendant Gomo owned approximately $933,000 worth of Micron stock.

40.    For the fiscal year ended September 3, 2020, Defendant Gomo received $410,001 in compensation. This included $160,000 in compensation and $250,001 in stock awards. For the fiscal year ended August 29, 2019, Defendant Gomo received $349,837 including $131,405 in fees earned or paid in cash and $218,432 in stock awards.

41.    Upon information and belief, Defendant Gomo is a citizen of California.

42.    The 2020 Proxy Statement stated the following, in relevant part, about Defendant Gomo:

-    Executive Vice President, Finance and Chief Financial Officer from October 2004 until his retirement in December 2011, and Senior Vice President, Finance and Chief Financial Officer from August 2002 to September 2004 at NetApp, Inc., a storage and data management company.

-    Within the past five years, Mr. Gomo served on the Board of Directors of SanDisk Corporation and NetSuite, Inc.

* * *

Mr. Gomo's experience as the chief financial officer of a public technology company provides our Board expertise in the technology industry, particularly in the areas of finance, accounting, treasury, investor relations, and securities, which contribute valuable insights and perspectives to our business and operations. We believe these experiences, qualifications, attributes, and skills qualify Mr. Gomo to serve as a member of our Board of Directors.

**Defendant Johnson**

43.    Defendant Johnson served as a Company director from June 2005 until her retirement in January 2019. She also served as Chair of the Audit Committee and Finance Committee.

44.    For the fiscal year ended August 29, 2019, Defendant Johnson received $318,402 in compensation, including $68,384 in fees earned or paid in cash and $250,018 in stock awards.

For the fiscal year ended August 30, 2018, Defendant Johnson received $427,602 in compensation from the Company. This included $177,619 in fees earned or cash paid and $249,983 in stock awards.

45.     Upon information and belief, Defendant Johnson is a citizen of California.

46.     The Company's Schedule 14A filed with the SEC on December 7, 2017 (the "2017 Proxy Statement") stated the following about Defendant Johnson:

> *Mercedes Johnson* was the Senior Vice President and Chief Financial Officer of Avago Technologies Limited, a supplier of analog interface components for communications, industrial, and consumer applications, from December 2005 to August 2008. She also served as the Senior Vice President, Finance of Lam Research Corporation from June 2004 to January 2005 and as Lam's Chief Financial Officer from May 1997 to May 2004. Ms. Johnson holds a degree in Accounting from the University of Buenos Aires and currently serves on the Board of Directors for Juniper Networks, Inc., Teradyne, Inc., and Synopsys, Inc. She also served on the Board of Directors for Intersil Corporation from August 2005 to February 2017. Ms. Johnson is the Chair of the Board of Directors' Audit Committee and Finance Committee.
>
> Ms. Johnson's experience as the Chief Financial Officer of several technology companies has given her expertise in finance, corporate development, corporate governance, management and operations.

**Defendant McCarthy**

47.     Defendant McCarthy has served as a Company director since October 2018. She also serves as Chair of the Finance Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of November 18, 2020, Defendant McCarthy beneficially owned 15,353 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on November 18, 2020 was $60.74, Defendant McCarthy owned approximately $933,000 worth of Micron stock.

48.     For the fiscal year ended September 3, 2020, Defendant McCarthy received $395,001 in compensation. This included $145,000 in fees earned or paid in cash and $250,001 in

stock awards. For the fiscal year ended August 29, 2019, Defendant McCarthy received $340,512 in total compensation, including $122,080 in fees earned or paid in cash and $218,432 in stock awards.

49.     Upon information and belief, Defendant McCarthy is a citizen of Arizona.

50.     The 2020 Proxy Statement said the following, in relevant part, about Defendant McCarthy:

-       Vice Chair of KPMG LLP, the U.S. member firm of the global audit, tax, and advisory services firm, from July 1998 until her retirement in December 2011. Ms. McCarthy joined KMPG in 1977, became a partner in 1987, and held numerous senior leadership positions with the firm during her tenure.

-       Within the past five years, Ms. McCarthy served on the Board of Directors of Andeavor Corporation and Mutual of Omaha

* * *

Ms. McCarthy's experience advising numerous companies on financial and accounting matters as a Certified Public Accountant (ret.) provides our Board deep technical expertise in financial and accounting matters, and contributes valuable insights and perspectives to our business and operations. We believe these experiences, qualifications, attributes, and skills qualify Ms. McCarthy to serve as a member of our Board of Directors.

**Defendant Mondry**

51.     Defendant Mondry served as a Company director from April 2005 until his retirement in January 2019. He also served as Chair of the Compensation Committee and the Governance and Sustainability Committee and as a member of the Finance Committee.

52.     For the fiscal year ended August 29, 2019, Defendant Mondry received $308,904 in compensation from the Company, including $58,886 in fees earned or paid in cash and $250,018 in stock awards. For the fiscal year ended August 30, 2018, Defendant Mondry received $419,253

in compensation from the Company. This included $169,270 in fees earned or cash paid and $249,983 in stock awards.

53.    Upon information and belief, Defendant Mondry is a citizen of Texas.

54.    The Company's 2017 Proxy Statement stated the following about Defendant Mondry:

> *Lawrence N. Mondry* has been the President and Chief Executive Officer of Stream Gas & Electric, Ltd., a provider of energy, mobile and protective services, since February 2016. Mr. Mondry was the Chief Executive Officer of Apollo Brands, a consumer products portfolio company, from February 2014 to February 2015. Mr. Mondry was the Chief Executive Officer of Flexi Compras Corporation, a rent-to-own retailer, from June 2013 to February 2014. Mr. Mondry was the President and Chief Executive Officer of CSK Auto Corporation, a specialty retailer of automotive aftermarket parts, from August 2007 to July 2008. Prior to his appointment at CSK, Mr. Mondry served as the Chief Executive Officer of CompUSA Inc. from November 2003 to May 2006. Mr. Mondry is the Chair of the Board of Directors' Compensation Committee and Governance and Sustainability Committee.
>
> Mr. Mondry's experience as the Chief Executive Officer of various retailers has given him expertise in operations, management, finance and corporate development. Mr. Mondry's retail expertise is especially relevant to our Crucial business.

**Defendant Switz**

55.    Defendant Switz has served as a Company director since February 2006 and as Chairman of the Board since February 2012. He also serves as the Chair of the Compensation Committee and as a member of the Governance and Sustainability Committee. According to the 2020 Proxy Statement, as of November 18, 2020, Defendant Switz beneficially owned 61,356 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 18, 2020 was $60.74, Defendant Switz owned more than $3.7 million worth of Micron stock.

56.     For the fiscal year ended September 3, 2020, Defendant Switz received $555,001 in total compensation, including $305,000 in fees earned or paid in cash and $250,001 in stock awards. For the fiscal year ended August 29, 2019, Defendant Switz received $543,669 in compensation including $293,651 in fees earned or paid in cash and $250,018 in stock awards. For the fiscal year ended August 30, 2018, Defendant Switz received $526,090 in compensation from the Company. This included $276,107 in fees earned or cash paid and $249,983 in stock awards.

57.     Upon information and belief, Defendant Switz is a citizen of Arizona.

58.     The Company's 2020 Proxy Statement stated the following about Defendant Switz, in relevant part:

- President and Chief Executive Officer of ADC Telecommunications, Inc., a supplier of network infrastructure products and services, from August 2003 until December 2010 and Chairman from 2008 until December 2010, when Tyco Electronics Ltd. acquired ADC. Mr. Switz joined ADC in 1994 and throughout his career there held numerous leadership positions.
- Within the past five years, Mr. Switz served on the Board of Directors of GT Advanced Technologies Inc., Broadcom Corporation, and Gigamon, Inc.

* * *

Appointed Chairman of Micron's Board of Directors in 2012, Mr. Switz's experience as Chief Executive Officer and Chairman of a leading technology company and history and leadership on Micron's Board provide the Board expertise in the technology industry as well as international business operations, finance, corporate development, corporate governance, and management, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Mr. Switz to serve as a member of our Board of Directors.

**Defendant Wright**

59.     Defendant Wright has served as a Company director since July 2019. She also serves as a member of both the Compensation Committee and the Governance and Sustainability Committee. According to the 2020 Proxy Statement, as of November 18, 2020, Defendant Wright

beneficially owned 11,262 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 18, 2020 was $60.74, Defendant Wright owned approximately $684,000 worth of Micron stock.

60.    For the fiscal year ended September 3, 2020, Defendant Wright received $375,001 in compensation, including $125,000 in fees earned or paid in cash and $250,001 in stock awards. For the fiscal year ended August 29, 2019, Defendant Wright received $62,047 in total compensation, including $20,833 in fees earned or paid in cash and $41,214 in stock awards.

61.    Upon information and belief, Defendant Wright is a citizen of Florida.

62.    The 2020 Proxy Statement states the following about Defendant Wright, in relevant part:

> - Group Vice President of Engineering and Product Development of Johnson Controls International ("JCI") from 2013 to 2017. Ms. Wright also served as Vice President and General Manager for Johnson Controls' Hybrid Systems business and as CEO of Johnson Controls-Saft from 2007 to 2009.
>
> - Prior to joining JCI, Ms. Wright served in the Office of the Chair and was EVP Engineering, Sales and Program Management at Collins & Aikman from 2006 to 2007.
> - Prior to that, Ms. Wright held several executive positions at Ford Motor Company, including Chief Engineer, from 2003 to 2005, and Director of Sustainable Mobility Technologies and Hybrid and Fuel Cell Vehicle Programs from 2004 to 2005.
>
> - Within the past five years, Ms. Wright served on the Board of Directors of Delphi Technologies.
>
> ***
>
> Ms. Wright's extensive experience in, and knowledge of, the automotive industry (OEM and Tier 1 supplier), public board experience and her expertise in vehicle, advance powertrain, and energy storage system technologies, provide our Board expertise in the technology industry as well as business operations, finance, corporate development, corporate governance, and management, all of which are critical to achieving our strategic objectives. We believe these experiences, qualifications, attributes, and skills qualify Ms. Wright to serve as a member of our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63.    Due to their positions as officers and/or directors as well as fiduciaries of Micron, and because they controlled the corporate affairs of Micron, the Individual Defendants owed Micron and its shareholders fiduciary duties of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Micron in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in the best interests of Micron and its shareholders so as to benefit all shareholders equally.

64.    Micron's directors and officers each owe to the Company and its shareholders a fiduciary duty of good faith and diligence in the administration of the Company's affairs as well as in the use, and preservation of, the Company's assets.

65.    Because they control the Company and each hold positions of authority, the Individual Defendants, as directors and/or officers, were able to, and did, directly and/or indirectly exercise control over the wrongful actions complained of herein.

66.    The Company's directors and officers were required to exercise reasonable and prudent supervision over the management, policies, internal controls, and operations of the Company to effectively discharge their duties.

67.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Micron, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Micron's Board at all relevant times.

68.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's operations, diversity efforts, and internal controls, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC including all those facts described in this Complaint that it failed to disclose. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets including by paying themselves unjust compensation.

69.     The officers and directors of Micron, to effectively discharge their duties, were required to exercise reasonable and prudent supervision over the Company. Because of their duties, the officers and directors of Micron were required, *inter alia*, to:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Idaho, and the United States, and in accordance with Micron's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in a manner so as to make it possible to provide the highest quality performance of its business, to not waste the Company's assets, and to maximize the Company's value;

(c)      remain informed about the conduct of Micron's operations, and, upon receipt of notice of imprudent or unsound practices, to make reasonable inquiry into such practices and to take steps to remedy them;

(d)      maintain comprehensive and accurate records and reports of the affairs of Micron and to maintain procedures for reporting these affairs to the Board as well as to periodically investigate, or cause independent investigation of, those records and reports;

(e)      maintain and implement an adequate and functioning system of internal controls so Micron's operations would comply with all applicable laws;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other information concerning the affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, the Company's diversity, equality, and inclusion efforts.

70.      Furthermore, the Individual Defendants owed to Micron, and Micron's shareholders, the duty of loyalty. This duty requires that each favor Micron's interest and that of its shareholders over their own and refrain from using their position within the Company for personal advantage.

71.      At all relevant times, the Individual Defendants were the agents of each other and of Micron and were acting within the course and scope of such agency.

72.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Micron.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

74.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Sections 14(a) of the Exchange Act.

75.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Micron, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

76.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

77.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Micron and was at all times acting within the course and scope of such agency.

## MICRON'S CODE OF CONDUCT

78.     The Company's Code of Conduct, states that it, "applies to everyone who works on Micron's behalf worldwide, including team members (employees, officers and directors), and temporary workers. We are all expected to adhere to the standards contained in this Code."

79.     The Company's Code of Conduct under the section, "Diversity, Equality and Inclusion (DEI)," states:

> At Micron, our team members are a critical driver of our competitive advantage. We believe our best innovation springs from our team members' diverse experiences, perspectives and backgrounds. Our Company takes a broad view of diversity. Diversity is more than one dimension. Diversity includes race, ethnicity, gender, sexual orientation, socioeconomic status, disability and age, among other things. It can be visible or invisible. Equality means that everyone at Micron has the opportunity to develop, contribute and advance – regardless of identity. Inclusion means our team members are seen, heard, valued and respected. ***Micron is committed to building a diverse and inclusive culture where people feel valued for who they are, how they think and what they bring, where all team members can develop and thrive.***
>
> Providing a workplace free of discrimination, where all team members are treated fairly and with respect, is essential to fostering a culture of inclusion. Our Company strictly prohibits any form of unlawful discrimination against any team member or applicant for employment. ***We recruit, hire, train, promote, discipline and make other employment decisions without regard to race, color, ethnicity, religion, gender, sexual orientation, gender identity and expression, age, national origin, disability, veteran status, marital status or other classifications protected under***

***law or Company policy.*** In addition, we are committed to providing reasonable accommodation for team members' disabilities or religious beliefs and practices.

(Emphasis added.)

80.    The Code of Conduct also states the following under "Books and Records":

***We all play a role in ensuring the integrity of our financial books, records and disclosures.*** Whatever information you record for our Company — from hours worked to product inventory, travel expenses, tax records or accounting — ***you must help ensure that the business information we report is accurate, complete and timely***. . . . The information we record helps our Company plan for the future. It also informs the financial data we report to shareholders and regulators. To make sure our Company can plan correctly and that our shareholders and regulators (including taxing authorities) have accurate information, ***our books and records — whether paper or electronic — must always be complete and honest***. They must fairly reflect our business assets, liabilities, expenses and revenue. ***We all have a duty to maintain our books and records in accordance with U.S. Generally Accepted Accounting Principles (GAAP) and any other regulatory requirements that apply to a multinational, publicly traded company.*** We also have a duty not to perform, and not to facilitate others in performing, any act of fraud or tax evasion.

(Emphasis added.)

81.    Finally, the Code of Conduct states under "Duty to Report" that:

[T]eam members are expected to report good faith concerns about potential violations of law or Micron policy. Open reporting is an essential component of our compliance processes. Team members can report concerns through many channels, including anonymously on our Compliance Hotline or to supervisors, managers, the Legal Department, Human Resources or Security. Team members who are unsure whether a report is warranted should consult with a supervisor, Human Resources or the Legal department to discuss the matter further.

82.    The Individual Defendants violated the Code of Conduct by causing the Company to engage in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of Sections 14(a) the Exchange Act, and failing to report the same.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Lack of Diversity in the Company**

83.     In 2018, the Company released its first DEI Report (the "2018 DEI Report"). It described how the Company had a "formal [Diversity & Inclusion] function in place to address opportunities to make Micron a more diverse and inclusive workplace for all. While Micron is rich in many forms of diversity — cultural, linguistic, and diversity of thought — we've realized, like many of our peers in the technology and engineering sectors, that not all groups are well represented within our workforce." The 2018 further stated that the Company was "passionate about creating a diverse and inclusive environment, representative of our communities and the customers we serve."

84.     However, the actual data the 2018 DEI Report reported was not as rosy as the language it was couched in. The 2018 DEI Report disclosed that the Company had "34,000+" employees, of which 28% worked in the "Americas." This means approximately 9,520 employees worked in the Americas.[1]

85.     The 2018 DEI Report further disclosed the following charts:

---

[1] The 2018 DEI Report does not disclose a breakdown between North, Central, or South America. As the diversity data in each DEI Report gives diversity data only for the U.S. but does not disclose how much of the "Americas" workforce is the U.S. workforce, for the purposes of the approximations in this complaint, all of the "Americas" staff will be treated as U.S.-based.



86.     As one can see, the vast majority of employees in every category were White people and the second largest group in every category were Asian people, both overrepresented as compared to those groups percentage of the general U.S. population.[2] Greatly underrepresented were the 3% of the overall U.S. workforce who were Black, or around 285 of an estimated 9,520, and the 4%, about 380 of an estimated 9,520, who were Hispanic/Latinx, with the same percentages for "Technical & Engineering" positions. "Management" was even more disappointing, with only 2% of managers being Black and 4% being Hispanic/Latinx. In "Senior

---

[2] According to Census Bureau estimates, Asian people constitute about 5.9% of the U.S. population, while Black people constitute about 13.4%, Hispanic/Latinx people constitute 18.5%, and non-Hispanic White people constitute 60.1%.
https://www.census.gov/quickfacts/fact/table/US/PST045219 (last visited January 20, 2020).

Leadership," Black people constituted less than 1% of employees and Hispanic/Latinx people constituted only 1%.

87.     After a year, in 2019, the Company published the 2019 DEI Report. While it highlighted some nominal efforts the Company was undertaking, including hiring a vice president of Diversity, Equality and Inclusion, it still revealed a shocking lack of diversity within the Company's ranks. Moreover, it disclosed that the Company had over 37,000 employees with 26%, or about 9,620, in the Americas.

88.     The 2019 DEI Report contained the following charts:





89.     While the share of White workers overall did decrease by 2.9%, from 70% the prior year to 67.1% in 2019, they still constituted the vast majority of workers. Moreover, their loss did not represent meaningful gains by underrepresented racial groups. Asian employees, already overrepresented, increased by 2.2% from 21% to 23.2%, leaving just 0.7% of the share ceded by White employees to be divided among Black, Hispanic/Latinx, employees of two or more races, and employees all other racial/ethnic groups. In fact, Black and Hispanic/Latinx employees experienced no meaningful growth in their share of the Company workforce since 2018, with Black employees increasing from 3% to 3.1%, representing about 298 employees of 9,620, and Hispanic/Latinx employees increasing from 4% to 4.2%, representing about 404 employees of 9,620.

90.     As in 2018, the share of Black and Hispanic people in management and senior leadership positions trailed even their already extremely limited numbers in the general workforce, in some cases losing ground. Black people constituted only 1.5% of management in 2019, an actual decrease of 0.5% form 2% the year before, and only 1.7% of senior leadership, practically an unavoidable growth from the less than 1% the year before. Hispanic/Latinx people constituted only 3.2% of management in 2019, also a drop from the 4% the prior year, and only 2.3% of senior leadership, a 1.3% increase from the abysmally low 1% figure the prior year.

91.     In 2020, the Company again published its 2020 DEI Report. Again, while touting purported efforts the Company was undertaking, the actual data presented a different story. Moreover, the 2020 DEI Report disclosed that the Company had grown its workforce even more to 39,392 employees with 27%, or about 10,656, in the Americas.

92.     As in the two prior reports, the 2020 DEI Report contained the following charts:

## U.S. Race/Ethnicity Overall



**Black**
FY20: **3.0%**
FY19: **3.1%**

**Latinx**
FY20: **4.6%**
FY19: **4.2%**

**Asian**
FY20: **23.4%**
FY19: **23.3%**

**Other Underrepresented Races/Ethnicities**
FY20: **0.4%**
FY19: **0.5%**

**2 or More Races**
FY20:  **2.0%**
FY19:  **1.9%**

**White**
FY20: **66.6%**
FY19: **67.1%**



# U.S. Race & Ethnicity

| | FY19 | FY20 | U.S. Race/Ethnicity Senior Leaders | | FY19 | FY20 | U.S. Race/Ethnicity Management |
|---|---|---|---|---|---|---|---|
| | 75.7% | 70.0% | | | 75.8% | 74.9% | |
| | 19.5% | 24.6% | | | 18.0% | 18.3% | |
| | 2.3% | 2.7% | | | 3.2% | 3.3% | |
| | 0.6% | 1.0% | | | 1.5% | 1.7% | |
| | 1.7% | 1.6% | | | 1.1% | 1.3% | |
| | 0.2% | 0.2% | | | 0.4% | 0.5% | |

| | FY19 | FY20 | U.S. Race/Ethnicity Technical/Engineering | | FY19 | FY20 | U.S. Race/Ethnicity Non-Technical |
|---|---|---|---|---|---|---|---|
| | 62.8% | 63.8% | | | 75.9% | 72.8% | |
| | 27.3% | 26.1% | | | 11.5% | 13.4% | |
| | 4.3% | 4.9% | | | 4.9% | 5.0% | |
| | 3.3% | 3.0% | | | 4.4% | 5.0% | |
| | 1.9% | 1.9% | | | 2.4% | 3.0% | |
| | 0.4% | 0.3% | | | 0.9% | 0.8% | |

● White   ● Asian   ● Latinx   ● Black   ● 2 or more races   ● Other underrepresented races/ethnicities

93.     While the share of White employees did again decrease, it was by only half of a percentage point and they still constituted the vast majority of employees and were still overrepresented as compared to the share of White people who make up the U.S. population. And while the share of Latinx employees did increase, by a meager 0.4% from 4.2% to 4.6%, comprising about 490 employees of approximately 10,656, Black employees actually ***decreased*** as a share of employees from 3.1% to 3%, comprising about 320 employees of 10,656.

94.     As in years previous, the numbers of Black and Latinx employees in management or senior leadership positions trailed the overall workforce. Moreover, the 2019 numbers in the

29

2020 DEI report did not in all cases match the numbers from the 2019 DEI Report. For example, while the 2020 DEI Report shows an increase in Black senior leaders, from 0.6% to 1.0%, this would actually be a drop, of 0.7%, from the 1.7% of Black senior leaders listed in the 2019 DEI Report. The numbers which remain consistent between reports are nevertheless not indicative of meaningful diversity. Latinx senior leaders grew from just 2.3% to 2.7%, Latinx management hardly grew at all, from 3.2% to 3.3%, and Black management grew abysmally from 1.5% to 1.7%.

95.     What these figures demonstrate, is that contrary to the Company's so-called commitment to diversity, the Company was committed to no meaningful change from the start of this formal effort in 2018 until 2020. From 2018 to 2020, the share of Black employees overall was exactly *flat* 3% to 3%. The share of Latinx employees grew just 0.6%, from 4% to 4.6%. For senior leadership in that time, Black employees gained ground from "less than 1%" to 1%. However, Black management *shrunk* from 2% to 1.7%. Latinx senior leadership had the largest, and still extremely meager gains, from 1% to 2.7%, but Latinx management also *shrunk* from 4% to 3.3%. Given these figures, the utter noncommitment the Company and Individual Defendants have towards diversity is clear. From 2018 to 2020, even as the Company expanded by about 1,000 more employees in the Americas, only around 35 were Black and 110 Latinx. It is a commitment to talk about diversity but not a commitment to make any meaningful strides towards it; the proof is in the data.

96.     This phantom commitment to diversity is evidenced even further by the composition of Micron's Board during this period. While publicly touting their commitment to diversity within the Company, the above data shows that that commitment was in words only, and not actions. Likewise, on the Board, during the time of these DEI Reports, every director was a White individuals with the exception of the CEO, Defendant Mehrotra. This is in keeping with

Micron's trend of making nominal commitments to diversity, hardly diversifying their workforce, and doing even less to diversify the holders of their management, senior leadership, and director positions.

### False and Misleading Proxy Statements

#### December 6, 2018 Proxy Statement

97.     On December 6, 2018, the Company filed its 2018 Proxy Statement with the SEC. It was solicited by the Board of Directors, who at that time consisted of Defendants Bailey, Beyer, Byrne, Gomo, Johnson, McCarthy, Mehrota, Mondry, and Switz. It contained material misstatements and omissions.[3]

98.     The 2018 Proxy Statement stated, in relevant part, "***Micron is focused on cultivating a diverse and inclusive culture*** in which all of our team members feel valued for who they are, how they think, and how they solve problems. We released our inaugural Diversity and Inclusion FY18 Annual Report where you can find more information about ***how we are addressing this key priority.***"

99.     The 2018 Proxy Statement also contained the following "Report of the Audit Committee of the Board of Directors," in relevant part:

> The purpose of the Audit Committee is to assist the Board of Directors in overseeing and monitoring (i) the integrity of our financial statements, (ii) the performance of our internal audit function, (iii) the performance of our Independent Registered Public Accounting Firm, (iv) the qualifications and independence of our Independent Registered Public Accounting Firm, and (v) our compliance with legal and regulatory requirements.

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

The Audit Committee has reviewed and discussed our audited financial statements with our management, which has primary responsibility for such financial statements. PwC, our Independent Registered Public Accounting Firm for fiscal 2018, has expressed in our Annual Report on Form 10-K its opinion as to the conformity of our consolidated financial statements with accounting principles generally accepted in the United States. The Audit Committee has discussed with PwC the matters that are required to be discussed by Statement on Auditing Standards No. 61, as amended (Public Company Accounting Oversight Board, Professional Standards, Volume 1, AU Section 380). PwC has provided to the Audit Committee the written disclosures and the letter required by applicable requirements of the Public Accounting Oversight Board. The Audit Committee and PwC also discussed PwC's independence, including the non-audit services PwC provided to us as described above, and concluded that PwC was independent for fiscal 2018.

On the basis of the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that they include our audited consolidated financial statements in our Annual Report on Form 10-K for fiscal 2018, appointed PwC as our Independent Registered Public Accounting Firm for the fiscal year ending August 29, 2019, and approved and authorized PwC to carry out and perform certain specified non-audit services for us in fiscal 2019.

This report was signed by Defendants Bailey, Byrne, Gomo, Johnson, and McCarthy who comprised the Audit Committee at that time.

100.    The 2018 Proxy Statement also contained proposals to be voted on by shareholders including the reelection Defendants Bailey, Beyer, Byrne, Gomo, McCarthy, Mehrotra, and Switz to the Board, the ratification of PricewaterhouseCoopers LLP ("PwC") as the Company's independent auditor for fiscal year 2019, and a nonbinding resolution approving of executive compensation. Based in part on the false and misleading statements contained in the 2018 Proxy Statement, each proposal was approved by the Company's shareholders.

***December 9, 2019 Proxy Statement***

101.    On December 9, 2019 the Company filed its 2019 Proxy Statement with the SEC. It was solicited by the Board of Directors who at that time consisted of Defendants Bailey, Beyer,

Byrne, Gomo, McCarthy, Mehrotra, Switz, and Wright. It contained material misstatements and

omissions.[4]

102.    The 2019 Proxy Statement said the following about the Board's Governance and

Sustainability Committee's evaluation of Board composition:

> *In evaluating the existing Board and any desired characteristics of potential nominees, the Governance and Sustainability Committee considers* the knowledge, experience, integrity, and judgment of the candidates, their contribution to *the diversity of backgrounds, experience and skills on the Board,* and their ability to devote sufficient time and effort to their duties as directors.

(Emphasis added.)

103.    In addition, "[t]he Governance and Sustainability Committee is committed to

*continuing to identify and recruit highly qualified director candidates with diverse experiences,*

*perspectives, and backgrounds to join our Board*." (Emphasis added.)

104.    Moreover, the 2019 Proxy Statement added that:

> [T]he Board seeks *to maintain a balance of perspectives*, qualities, and skills on the Board *to obtain a diversity of viewpoints* to better understand the technical, economic, political, and social environments in which we operate and to enhance Micron's performance. *Accordingly, the Governance and Sustainability Committee takes into account the personal characteristics, experience, and skills of current and prospective directors, including* gender, *race, and ethnicity*, to ensure that our Board comprises a broad range of perspectives, and *measures success by the range of viewpoints represented on the Board.*

(Emphasis added.)

105.    The 2019 Proxy Statement even had a section titled "Diversity, Equality and

Inclusion" under which it claimed, in relevant part:

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

> *We believe* our people are our most important resource and a critical driver of our competitive advantage, and *that our best innovation springs from our team members' diverse experiences, perspectives, and backgrounds. Our Board of Directors considers the creation and maintenance of a diverse and inclusive environment to be a crucial element of the Company's business strategy,* including effectively addressing customer, shareholder, and other stakeholder needs, *and believes each Micron hire is an opportunity to enhance the competencies, skills, talent, experience, and perspectives in our Company with diverse perspectives, backgrounds, and viewpoints. The Board has tasked the Company's management team with taking a proactive approach to diversity, equality and inclusion,* and periodically reviews our programs and processes to ensure continual improvement.

(Emphasis added.)

106.    The 2019 Proxy Statement also stated that the Company's executive compensation program's "*primary long-term objective* is to drive sustainable value creation for our shareholders *by attracting, retaining, developing, and motivating a diverse group of top executive talent*" and that part of executive pay was determined by "*commitment to* sustainability and *diversity, equality, and inclusion programs and initiatives*." (Emphasis added.)

107.    In addition, the 2019 Proxy Statement contained the following "Report of the Audit Committee of the Board of Directors," in relevant part:

> The purpose of the Audit Committee is to assist the Board of Directors in overseeing and monitoring (i) the integrity of our financial statements, (ii) the performance of our internal audit function, (iii) the performance of our Independent Registered Public Accounting Firm, (iv) the qualifications and independence of our Independent Registered Public Accounting Firm, and (v) our compliance with legal and regulatory requirements.

> The Audit Committee has reviewed and discussed our audited financial statements with our management, which has primary responsibility for such financial statements. PwC, our Independent Registered Public Accounting Firm for fiscal 2019, has expressed in our Annual Report on Form 10-K its opinion as to the conformity of our consolidated financial statements with accounting principles generally accepted in the United States. The Audit Committee has discussed with PwC the matters that are required to be discussed by the standards of the Public Company Accounting Oversight Board. PwC has provided to the Audit Committee the written disclosures and the letter required by the applicable requirements of the Public Company Accounting Oversight Board. The Audit Committee and PwC also

discussed PwC's independence, including the non-audit services PwC provided to us as described above, and concluded that PwC was independent for fiscal 2019.

On the basis of the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that they include our audited consolidated financial statements in our Annual Report on Form 10-K for fiscal 2019, appointed PwC as our Independent Registered Public Accounting Firm for the fiscal year ending September 3, 2020, and approved and authorized PwC to carry out and perform certain specified non-audit services for us in fiscal 2020.

The report was signed by Defendants Bailey, Byrne, Gomo, and McCarthy, who comprised the Audit Committee at that time.

108.    The 2019 Proxy Statement also contained proposals to be voted on by shareholders including the reelection Defendants Bailey, Beyer, Gomo, McCarthy, Mehrotra, Switz, and Wright to the Board,  PwC as the Company's independent auditor for fiscal year 2020, and a nonbinding resolution approving of executive compensation. Based in part on the false and misleading statements contained in the 2019 Proxy Statement, each proposal was approved by the Company's shareholders.

### December 1, 2020 Proxy Statement

109.    On December 1, 2020 the Company filed its 2020 Proxy Statement with the SEC. It was solicited by the Board which consisted of Defendants Bailey, Beyer, Dugle, Gomo, McCarthy, Mehrotra, Switz, and Wright. It contained material misstatements and omissions.[5]

110.    The 2020 Proxy Statement repeats the prior year's Proxy Statement concerning the Company's policy as concerns identifying new directors:

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

> *In evaluating the existing Board and any desired characteristics of potential nominees, the Governance and Sustainability Committee considers* the knowledge, experience, integrity, and judgment of the candidates, their contribution to *the diversity of backgrounds, experience and skills on the Board,* and their ability to devote sufficient time and effort to their duties as directors.

(Emphasis added.)

111.   The 2020 Proxy Statement continues that:

> Although the Governance and Sustainability Committee has not established specific diversity guidelines, *the Board seeks to maintain a balance of perspectives, qualities, and skills on the Board to obtain a diversity of viewpoints* to better understand the technical, economic, political, and social environments in which we operate and to enhance Micron's performance. *Accordingly, the Governance and Sustainability Committee takes into account the personal characteristics,* experience, and skills of current and prospective directors, *including gender, race, and ethnicity, to ensure that our Board comprises a broad range of perspectives,* and measures success by the range of viewpoints represented on the Board.

(Emphasis added.)

112.   Moreover, after the 2020 Proxy Statement reiterates that the "Governance and Sustainability Committee is *committed to continuing to identify and recruit highly qualified director candidates with diverse experiences, perspectives, and backgrounds to join our Board.*" (Emphasis added.) To that end, the 2020 Proxy Statement also states that the "Governance and Sustainability *Committee has identified and continually refines a list of skills, attributes and experiences that it believes will result in an effective, dynamic and diverse Board*. The Governance and Sustainability Committee *then reviews each director on a matrix in an effort to identify needed skills, experiences or perspectives*. The Governance and Sustainability Committee *uses the insights this matrix provides to* recommend committee assignments and *inform searches for new director candidates* or opportunities to refresh Board composition." (Emphasis added.)

113.    Under the section heading, "Diversity, Equality and Inclusion," the 2020 Proxy

Statement states the following, in relevant part:

> We believe our people are our most important resource and a critical driver of our competitive advantage. *We also believe that our best innovation springs from our team members' diverse experiences, perspectives, and backgrounds. Our Board considers the creation and maintenance of a diverse and inclusive environment to be a crucial element of the Company's business strategy*, including effectively addressing customer, shareholder, and other stakeholder needs, *and believes each Micron hire is an opportunity to enhance the competencies, skills, talent, experience, and perspectives in our Company with diverse perspectives, backgrounds, and viewpoints. The Board has tasked the Company's management team with taking a proactive approach to diversity*, equality, and inclusion, and periodically reviews our programs and processes to ensure continual improvement.
>
> \* \* \*
>
> Our Board believes a diverse workforce is a competitive advantage and that diverse teams drive more innovation, delivering value to our customers and increased returns to shareholders. We believe diverse teams expand creativity and problem-solving, lead to better decision-making, and enhance team member engagement and retention*. Encouraged by our Board, we actively pursue a diverse talent pool using advanced technologies and inclusive hiring practices*, and we partner with universities around the world to help us grow a workforce that reflects our customers and our communities.

(Emphasis added.)

114.    The 2020 Proxy Statement also stated that the Company's executive compensation

program's "*primary long-term objective* is to drive sustainable value creation for our shareholders

*by attracting, retaining, developing, and motivating a diverse group of top executive talent*" and

that part of executive pay was determined by "*commitment to* sustainability and *diversity, equality,*

*and inclusion programs and initiatives*." (Emphasis added.)

115.    In addition, the 2020 Proxy Statement contained the following "Report of the Audit

Committee of the Board of Directors," in relevant part:

> The purpose of the Audit Committee is to assist the Board of Directors in overseeing and monitoring (i) the integrity of our financial statements, (ii) the adequacy of our internal controls and procedures, (iii) the performance of our

internal audit function, (iv) the performance of our Independent Registered Public Accounting Firm, (v) the qualifications and independence of our Independent Registered Public Accounting Firm, and (vi) our compliance with legal and regulatory requirements.

The Audit Committee has reviewed and discussed our audited financial statements with our management, which has primary responsibility for such financial statements. PwC, our Independent Registered Public Accounting Firm for fiscal 2020, has expressed in our Annual Report on Form 10-K its opinion as to the conformity of our consolidated financial statements with accounting principles generally accepted in the United States. The Audit Committee has discussed with PwC the matters that are required to be discussed by the standards of the Public Company Accounting Oversight Board. PwC has provided to the Audit Committee the written disclosures and the letter required by the applicable requirements of the Public Company Accounting Oversight Board. The Audit Committee and PwC also discussed PwC's independence, including the non-audit services PwC provided to us as described above, and concluded that PwC was independent for fiscal 2020.

On the basis of the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that they include our audited consolidated financial statements in our Annual Report on Form 10-K for fiscal 2020, appointed PwC as our Independent Registered Public Accounting Firm for the fiscal year ending September 2, 2021, and approved and authorized PwC to carry out and perform certain specified non-audit services for us in fiscal 2021.

The report was signed by Defendants Bailey, Gomo, and McCarthy who comprised the Audit Committee at the time.

116.    The 2020 Proxy Statement also contained proposals to be voted on by shareholders including the reelection Defendants Beyer, Dugle, Gomo, McCarthy, Mehrotra, Switz, and Wright to the Board, the ratification of PwC as the Company's independent auditor for fiscal year 2021, approval of an equity incentive plan for, *inter alia*, Company executives and directors, and a nonbinding resolution approving of executive compensation. Based in part on the false and misleading statements contained in the 2020 Proxy Statement, each proposal was approved by the Company's shareholders.

117.    The statements contained in ¶¶ 97–98, 101–106, 109–114 were materially false and misleading. While touting the importance of diversity to the Company, the extent to which

diversity was considered in the selection of Board candidates, the efforts the Company was undertaking to diversify its workforce, and the connection between executive pay and diversity initiatives, in reality diversity was not a key priority of the Company; no racially or ethnically diverse Board candidates were added during this time; as discussed above, workforce diversity remained flat, barely grew, or in the cases of certain management and leadership positions actually declined among Black and Latinx employees even as around 1,000 new positions were created in the Americas with the Company; and executive compensation, in the case of Defendant Mehrotra as well as others, continued to grow year over year. Moreover, each report of the Audit Committee contained the 2018, 2019, and 2020 Proxy Statements was false and misleading because PwC was not independent and PwC was inaccurately attesting to the sufficiency of the Company's internal controls even as the Company continued making false and misleading statements. Therefore, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make materially false and misleading statements that failed to disclose that: (1) despite public assertions to the contrary diversity was not a key priority of the Company; (2) despite assertions to the contrary the Company was not meaningfully diversifying its workforce; (3) despite assertions to the contrary the Company was not diversifying its leadership or its Board of Directors; (4) that the Company failed to maintain adequate internal controls, and (5) that the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls.

### PwC Was Not an Independent Auditor and the Directors Breached Their Fiduciary Duties by Continually Renominating It

118.    PwC labelled the Company's internal controls as adequate, year after year, even as the Company continued including false and misleading statements in its Proxy Statements. Despite

this, the Board, and in particular the Audit Committee, continued to vouch for, *inter alia*, the adequacy of the Company's internal controls, the performance of PwC as independent auditor, and PwC's independence. However, PwC, and its predecessor Coopers and Lybrand LLP, has been the Company's independent auditor since 1984 during which time the Company has paid PwC multiple millions of dollars, including $10.2 million for fiscal year 2020, $14.2 million for fiscal year 2019, and $15.2 million for fiscal year 2018. The duration of this relationship, PwC's interest in continuing to receive such large fees, and the ongoing failure to of PwC to recognize the Company's inadequate internal controls which have led to numerous false and misleading statement in SEC filings demonstrate the inability of PwC to be an adequate independent auditor. The Board's, and the Audit Committee's, continued nomination of PwC to this role is thus a breach of the Individual Defendant's fiduciary duties.

### Excessive Compensation

119.   In addition to, and in light of, the misconduct alleged above, the Individual Defendants caused the Company to pay them excessive compensation. Each Individual Defendant continued receiving substantial compensation even as they breached their fiduciary duties to the Company. Regardless of their misconduct, the Individual Defendants also received excessive compensation relative to compensation provided at comparable companies.

120.   In addition, Defendant Mehrotra as CEO continued receiving substantial compensation, increasing every year from 2018 to 2020, even as he was ostensibly being paid under a compensation plan, as described in the 2019 and 2020 Proxy Statements, under which compensation was determined in part by achieving certain diversity goals.

### DAMAGES TO MICRON

121.     As a direct and proximate result of the Individual Defendants' conduct, Micron has lost and expended, and will lose and expend, many millions of dollars.

122.     Such expenditures include, but are not limited to, legal fees associated with the lack of diversity at the Company including as the result of discrimination and harassment suits, wrongful termination claims, suits concerning the absence of pay equity, and amounts paid to outside lawyers, accountants, and investigators in connection to any such lawsuits. Such expenditures also include the costs associated with remedying the underlying discrimination at the Company.

123.     Moreover, these expenditures include fees paid to PwC for its independent auditing services, when it was not independent and when it provided inadequate services considering the ongoing failure to identify the inadequate internal controls and to prevent false and misleading statements to be included in the Company's SEC filings.

124.     Additionally, these expenditures include, but are not limited to, the excessive compensation and benefits paid to the Individual Defendants in light of their misconduct including such amounts paid out in connection to meeting diversity goals. Regardless of their misconduct, their compensation was also excessive in comparison to comparable companies.

125.     Micron has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Section 14(a) of the Exchange Act.

## **DERIVATIVE ALLEGATIONS**

126.     Plaintiff brings this action derivatively, for the benefit of Micron, to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary

duties as directors and/or officers of Micron, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Section 14(a) of the Exchange Act as well as their aiding and abetting of this misconduct.

127.   Micron is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Micron. Plaintiff will adequately and fairly represent the interests of Micron, and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

130.   A pre-suit demand on the Board of Micron is futile and, thus, excused. At the time of the filing of this action, the Board consists of the following seven individuals: Defendants Mehrotra, Beyer, Dugle, Gomo, McCarthy, Switz, and Wright (the "Director-Defendants"). Plaintiff only needs to allege demand futility as to four of the seven Directors on the Board at the commencement of this action.

131.   Demand is excused as to all seven of the Director-Defendants because each one of them faces a substantial likelihood of liability as a result of the scheme they engaged in, knowingly or recklessly, which caused the Company to make false and misleading statements in the 2018, 2019, and 2020 Proxy Statements which failed to disclose that: (1) despite public assertions to the contrary diversity was not a key priority of the Company; (2) despite assertions to the contrary the Company was not meaningfully diversifying its workforce; (3) despite assertions to the contrary the Company was not diversifying its leadership or its Board of Directors; (4) that the Company

failed to maintain adequate internal controls, and (5) that the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls. This fact renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused the Company to engage in the discrimination which formed the basis of the false and misleading statements, to engage in the scheme to make false and misleading statements about the discrimination at the Company, to repeatedly reselect PwC as the Company's independent auditor even though PwC was neither independent nor even effective at ensuring the adequacy of the Company's internal controls, and to fail to maintain internal controls. Moreover, the Director-Defendants caused themselves to receive excessive compensation in light of their misconduct. Regardless of their misconduct, their compensation was also excessive in comparison to comparable companies. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133.    Demand is futile on Defendant Mehrotra for the following, additional reasons. Defendant Mehrotra has served as the Company's President, CEO, and as a member of the Board since May 2017. He also serves as a member of the Finance Committee. Therefore, as the Company admits, he is a non-independent director. The Company provides Defendant Mehrotra with his principal occupation, and he has received and continues to receive substantial compensation, including $19,995,488 during the fiscal year ended September 3, 2020. Defendant Mehrotra, as CEO, was ultimately responsible for the many false and misleading statements and

omissions that were made in the 2018, 2019, and 2020 Proxy Statements, all of which he solicited as a member of the Board. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to issue false and misleading statements, consciously disregarded his duties to monitor internal controls over engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He cannot impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. Therefore, Defendant Mehrotra breached his fiduciary duties, he faces a substantial likelihood of liability, he is not independent or disinterested, and demand upon him is futile and excused.

134.    Demand is futile on Defendant Beyer for the following, additional reasons. Defendant Beyer has served as a Company director since January 2013. He also serves as the Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee. As the Chair of the Governance and Sustainability Committee, he bears significant responsibility for the Company's failure to have any racially or ethnically diverse directors, with the exception of non-independent director, and CEO, Defendant Mehrotra. Moreover, as a member of the Compensation Committee, he is responsible for approving Defendant Mehrotra's excessive compensation, in light of Defendant Mehrotra's misconduct and despite the Company's putative policy of tying a portion of Defendant Mehrotra's pay to certain diversity goals. Defendant Beyer has received and continues to receive substantial compensation, including $395,001 during the fiscal year ended September 3, 2020. As a member of the Board who solicited each of the 2018, 2019, and 2020 Proxy Statements, Defendant Beyer is responsible for the many false and misleading statements contained therein. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to issue false and misleading

statements, consciously disregarded his duties to monitor internal controls over engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He cannot impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. Therefore, Defendant Beyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

135.    Demand is futile on Defendant Dugle for the following, additional reasons. Defendant Dugle has served as a Company director since August 2020. She also serves as a member of the Finance Committee. Defendant Dugle has received and continues to receive substantial compensation, including $28,378 for her approximate month of service during the fiscal year ended September 3, 2020. As a member of the Board who solicited the 2020 Proxy Statement, Defendant Dugle is responsible for the many false and misleading statements contained therein. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to issue false and misleading statements, consciously disregarded her duties to monitor internal controls over engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She cannot impartially consider a demand to take action against herself for causing the Company to award her excessive and unjust compensation. Therefore, Defendant Dugle breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and excused.

136.    Demand is futile on Defendant Gomo for the following, additional reasons. Defendant Gomo has served as a Company director since October 2018. He also serves as a Chair of the Audit Committee and as member of the Finance Committee. As a member of the Audit Committee who signed the "Report of the Audit Committee" contained in each of the 2018, 2019,

and 2020 Proxy Statements, Defendant Gomo bears responsibility for the failure of the Company to maintain internal controls and for the repeated appointment of PwC as independent auditor, when it was neither independent nor effective at ensuring the adequacy of the Company's internal controls. Defendant Gomo has received and continues to receive substantial compensation, including $410,001 during the fiscal year ended September 3, 2020. As a member of the Board who solicited each of the 2018, 2019, and 2020 Proxy Statements, Defendant Gomo is responsible for the many false and misleading statements contained therein. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to issue false and misleading statements, consciously disregarded his duties to monitor internal controls over engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He cannot impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. Therefore, Defendant Gomo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

137.    Demand is futile on Defendant McCarthy for the following, additional reasons. Defendant McCarthy has served as a Company director since October 2018. She also serves as the Chair of the Finance Committee and as a member of the Audit Committee. As a member of the Audit Committee who signed the "Report of the Audit Committee" contained in each of the 2018, 2019, and 2020 Proxy Statements, Defendant McCarthy bears responsibility for the failure of the Company to maintain internal controls and for the repeated appointment of PwC as independent auditor, when it was neither independent nor effective at ensuring the adequacy of the Company's internal controls. Defendant McCarthy has received and continues to receive substantial compensation, including $395,001 during the fiscal year ended September 3, 2020. As a member

of the Board who solicited each of the 2018, 2019, and 2020 Proxy Statements, Defendant McCarthy is responsible for the many false and misleading statements contained therein. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to issue false and misleading statements, consciously disregarded her duties to monitor internal controls over engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She cannot impartially consider a demand to take action against herself for causing the Company to award her excessive and unjust compensation. Therefore, Defendant McCarthy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and excused.

138.    Demand on Defendant Switz is futile for the following, additional reasons. Defendant Switz has served as a Company director since February 2006 and as Chairman of the Board since February 2012. He also serves as the Chair of the Compensation Committee and as a member of the Governance and Sustainability Committee. As Chair of the Compensation Committee, he bears significant responsibility for approving Defendant Mehrotra's excessive compensation, in light of Defendant Mehrotra's misconduct and despite the Company's putative policy of tying a portion of Defendant Mehrotra's pay to certain diversity goals. As a member of the Governance and Sustainability Committee, he is also responsible for the Company's failure to have any racially or ethnically diverse directors, with the exception of non-independent director, and CEO, Defendant Mehrotra. Defendant Switz has received and continues to receive substantial compensation, including $555,001 during the fiscal year ended September 3, 2020. As the Chairman of the Board which solicited the 2018, 2019, and 2020 Proxy Statements, Defendant Switz is responsible for the many false and misleading statements contained therein. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the

scheme to issue false and misleading statements, consciously disregarded his duties to monitor internal controls over engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He cannot impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Switz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Demand is futile on Defendant Wright for the following, additional reasons. Defendant Wright has served as a Company director since July 2019. She also serves as a member of both the Governance and Sustainability Committee and the Compensation Committee. As a member of the Governance and Sustainability Committee, she bears responsibility for the Company's failure to have any racially or ethnically diverse directors, with the exception of non-independent director, and CEO, Defendant Mehrotra. Moreover, as a member of the Compensation Committee, she is responsible for approving Defendant Mehrotra's excessive compensation, in light of Defendant Mehrotra's misconduct and despite the Company's putative policy of tying a portion of Defendant Mehrotra's pay to certain diversity goals. Defendant Wright has received and continues to receive substantial compensation, including $375,001 during the fiscal year ended September 3, 2020. As a member of the Board who solicited both the 2019 and 2020 Proxy Statements, Defendant Wright is responsible for the many false and misleading statements contained therein. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to issue false and misleading statements, consciously disregarded her duties to monitor internal controls over engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She cannot impartially consider a demand to take action against herself for causing the Company to award her excessive and unjust compensation.

Therefore, Defendant Wright breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and excused.

140.    Demand is futile on the Board for the following, additional reasons.

141.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Switz and Beyer have served together on Micron's Board since 2013, when Defendant Beyer joined. Both have served alongside Defendant Mehrotra for his entire tenure as CEO. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

142.    In violation of the Company's Code of Conduct, the Director-Defendants engaged in the scheme to  issue so many false and misleading statements concerning the Company's diversity initiatives. In further violation of the Code of Conduct the Director-Defendants caused the 2018, 2019, and 2020 Proxy Statements to not be accurate, complete, and honest. In addition, the Director-Defendants facilitated and disguised each other's violations of law including breaches of fiduciary duties, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. Moreover, the Director-Defendants failed to report these violations, which failure is itself a further violation of the Code of Conduct. As a result, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

143.    Micron has been, and will continue to be, exposed to significant losses and expenditures due to the wrongdoing of the Individual Defendants, including the Director-Defendants. To date, the Director-Defendants still have not filed any lawsuits against themselves or the others who were responsible for the scheme to issue materially false and misleading statements, the continued renomination of PwC as independent auditor despite its lack of independence and effectiveness at ensuring the adequacy of the Company's internal controls, or the paying to Individual Defendants excessive compensation,  in an attempt to recover or mitigate any of the damages Micron suffered and will continue to suffer as a result of such misconduct. Therefore, any demand upon the Director-Defendants would be futile.

144.    The Individual Defendants' conduct described herein could not have been the product of legitimate business judgment since it was the product of bad faith and intentional, reckless, or disloyal misconduct. As a result, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, who constitute the entire Board, face a substantial likelihood of liability, they have self-interest in the challenged transactions and are not able to exercise independent and disinterested judgment about whether to pursue this action. Therefore, demand is futile and excused.

145.    The acts complained of herein constitute violations of fiduciary duties owed by Micron's officers and directors. Such acts are incapable of ratification.

146.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Micron. If there is a directors' and officers' liability

insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants. Pursuant to such provisions, if the Director-Defendants were to sue themselves or certain of the officers of Micron, they would enjoy no insurance protection. Accordingly, the Director-Defendants cannot be expected to sue themselves or the relevant officers of Micron. However, if the suit is brought derivatively, as is this action, such insurance coverage, if it exists, will provide a basis for the Company to effectuate a recovery. Therefore, demand on the Director-Defendnats is futile and excused.

147.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Micron to sue the Individual Defendants, since they would then face a large, uninsured individual liability. Demand is futile and excused in either event.

148.    In light of the above, all of the Director-Defendants, and, therefore, at least, the requisite four directors, cannot consider a demand with disinterestedness and independence. Therefore, demand on the Board is futile and excused.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically

disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

151.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

153.    Under the direction and watch of the Directors, the 2018, 2019, and 2020 Proxy Statements failed to disclose, *inter alia*, that: (1) despite public assertions to the contrary diversity was not a key priority of the Company; (2) despite assertions to the contrary the Company was not meaningfully diversifying its workforce; (3) despite assertions to the contrary the Company was not diversifying its leadership or its Board of Directors; (4) that the Company failed to maintain adequate internal controls, and (5) that the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls.

154.    Moreover, the 2018, 2019, and 2020 Proxy Statements were false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Business Standards and the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to cause the Company to issue false and misleading statements and omissions of material fact.

155.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018, 2019, and 2020 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018, 2019, and 2020 Proxy Statement, including election of directors, appointment of an independent auditor, an advisory vote on executive compensation, and an approval of an incentive pay plan.

156.    The false and misleading elements of the 2018, 2019, and 2020 Proxy Statements led to the reelection of Individual Defendants which allowed them to continue breaching their fiduciary duties to Micron.

157.    The false and misleading statements led to the continued shareholder approval of PwC as indepdent auditor, when Pwc was neither independent nor effective in ensuring the adequacy of the Company's internal controls.

158.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018, 2019, and 2020 Proxy Statements.

159.    Plaintiff on behalf of Micron has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Breach of Fiduciary Duties**

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Each of the Individual Defendants owed to the Company the duty to exercise good faith, and loyalty in the management and administration of Micron's business and affairs.

162.    Each of the Individual Defendants violated and breached his or her fiduciary duties of good faith, loyalty, reasonable inquiry, oversight, and supervision.

163.    The Individual Defendants' conduct was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

164.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

165.    The Individual Defendants further breached their fiduciary duties by causing the Company to issue false and misleading statements which failed to disclose that: (1) despite public assertions to the contrary diversity was not a key priority of the Company; (2) despite assertions to the contrary the Company was not meaningfully diversifying its workforce; (3) despite assertions to the contrary the Company was not diversifying its leadership or its Board of Directors; (4) that the Company failed to maintain adequate internal controls, and (5) that the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls.

166. The Individual Defendants also breached their fiduciary duties by continuing to select PwC as their independent auditor when it was neither independent nor effective at ensuring the adequacy of the Company's internal controls

167. The Individual Defendants still further breached their fiduciary duties by causing themselves to receive compensation from the Company that was excessive given their misconduct and excessive given that executive pay was nominally tied, in part, to the achievement of certain diversity goals. Regardless of their misconduct, their compensation was also excessive in comparison to comparable companies.

168. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the scheme to issue false and misleading Proxy Statements, to reappoint PwC as independent auditor when it was neither independent nor effective at ensuring the adequacy of internal controls, and to pay themselves unjust compensation. Such improper conduct was committed knowingly or recklessly. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme and to prevent such conduct from continuing to occur.

169. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's interests.

170. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Micron has sustained, and continues to sustain, significant damages. As a result, the Individual Defendants are liable to the Company.

171. Plaintiff, on behalf of Micron, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

172.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

173.    By their misconduct and violations of law, the Individual Defendants were unjustly enriched at Micron's expense and to its detriment.

174.    The Individual Defendants benefitted financially from the improper conduct and/or received bonuses, stock options, or similar compensation from Micron, or received substantial compensation that was unjust due to the Individual Defendants' bad faith conduct.

175.    The Individual Defendants were also unjustly enriched by causing themselves to receive compensation from the Company that was excessive given their misconduct, and also excessive given the purported tie, in part, between executive compensation and the achievement of certain diversity-related goals. Regardless of their misconduct, their compensation was also excessive in comparison to comparable companies.

176.    Plaintiff, as a shareholder and a representative of Micron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

177.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and from lost financing and business from potential investors or customers who no longer trust the Company and its products.

180.    In addition, the Individual Defendants wasted corporate assets by paying tens of millions of dollars in fees to PwC as independent auditor, when PwC was neither independent nor effective at ensuring the adequacy of the Company's internal controls.

181.    Furthermore, the Individual Defendants caused themselves to receive compensation from the Company that was excessive given their misconduct, and also excessive given the purported tie, in part, between executive compensation and the achievement of certain diversity-related goals. Regardless of their misconduct, their compensation was also excessive in comparison to comparable companies.

182.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

183.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

184.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Micron, for which they are legally responsible.

57

186. As a direct and proximate result of the Individual Defendants' abuse of control, Micron has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Micron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187. Plaintiff on behalf of Micron has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Management

188. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Micron in a manner consistent with the operations of a publicly-held corporation.

190. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Micron has sustained and will continue to sustain significant damages.

191. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

192. Plaintiff on behalf of Micron has no adequate remedy at law.

## PRAYER FOR RELIEF

193. FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Micron, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Micron;

(c)     Determining and awarding to Micron the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Micron and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Micron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Micron to nominate at least four candidates for election to the Board, including three Black or otherwise racially or ethnically underrepresented individuals; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

4. a proposal to establish a fund to hire Black individuals and other minorities, promote Black individuals and other minorities to more management positions at the

Company, establish and maintain a mentorship program at Micron for Black individuals and other minorities that is committed to providing the skills and mentorship necessary to succeed at the Company;

     4. a proposal to establish and require annual training of Micron's entire Board and all executive officers, which training should focus at a minimum on diversity, antidiscrimination, and affirmative action, as well as other relevant topics; and

     5. a proposal to adopt a revised executive compensation program that ties 30% of executives' compensation to the achievement of certain specified diversity goals.

     (e)    Awarding Micron restitution from the Individual Defendants, and each of them;

     (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 9, 2021          Respectfully submitted,

Of Counsel:          **FARNAN LLP**

          /s/ Michael J. Farnan

**THE ROSEN LAW FIRM, P.A.**    Brian E. Farnan (Bar No. 4089)
Phillip Kim          Michael J. Farnan (Bar No. 5165)
275 Madison Avenue, 40th Floor    919 N. Market St., 12th Floor
New York, NY 10016       Wilmington, DE 19801
Telephone: (212) 686-1060     Telephone: (302) 777-0300
Facsimile: (212) 202-3287     Facsimile: (302) 777-0301
Email: pkim@rosenlegal.com    Email: bfarnan@farnanlaw.com
          Email: mfarnan@farnanlaw.com
          *Attorneys for Plaintiff*